UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TREPPEL FAMILY TRUST, Derivatively on Behalf of ABBVIE INC., <br><br>      Plaintiff, <br><br>   v. <br><br> RICHARD A. GONZALEZ, MICHAEL E. SEVERINO, ROBERT A. MICHAEL, JEFFREY R. STEWART, GLENN F. TILTON, ROBERT J. ALPERN, ROXANNE S. AUSTIN, WILLIAM H.L. BURNSIDE, FREDERICK H. WADDELL, EDWARD J. RAPP, EDWARD M. LIDDY, BRETT J. HART, MELODY B. MEYER, REBECCA B. ROBERTS, and THOMAS C. FREYMAN, <br><br>      Defendants, <br><br>   - and - <br><br> ABBVIE INC., a Delaware Corporation, <br><br>      Nominal Defendant. | JURY TRIAL DEMANDED <br><br><br> Case No. |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND VIOLATION OF SECURITIES LAW**

Plaintiff, by its attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty and Violation of Securities Law. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant AbbVie Inc. ("AbbVie" or the "Company") against certain of its officers and directors for breach of fiduciary duty and violations of law.  These wrongs resulted in damage to AbbVie's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed AbbVie to billions of dollars in potential liability for violations of state and federal law.

2.     AbbVie, and its fiduciaries, are currently in a race against time.  The Company is set to lose the patent protection for its key drug, Humira® in 2023.  Humira currently brings in more than $20 billion a year, more than one-third of AbbVie's revenues.  With the loss of Humira's patent protection, AbbVie will face generic competitors for the drug.  The Company's Chief Executive Officer ("CEO") has admitted than when that occurs, AbbVie expects to see "45% erosion, plus or minus 10%" in Humira sales.

3.     With this backdrop, it was vital that the Company's fiduciaries find a replacement revenue source for Humira before its 2023 expiration.  As explained below, the defendants led the market to believe they had done so with the drug Rinvoq®, a treatment for rheumatoid arthritis ("RA").

4.     Rinvoq falls into the family of drugs know that Janus kinase ("JAK") inhibitors.  As the name implies, JAK inhibitors prevent JAK enzymes from acting as a pathway for the messages from proteins called cytokines, which play a role in inflammation that causes many of negative effects of RA.  Defendants conditioned the market to believe that Rinvoq had blockbuster potential for the treatment of RA and other maladies.

5.     JAK inhibitors were not without side effects, however.  In fact, in approving Pfizer Inc.'s ("Pfizer") JAK inhibitor, Xeljanz®, the U.S. Food and Drug Administration ("FDA")

required Pfizer to continue safety studies, most importantly the ORAL Surveillance study. The results of this study were unfavorable. The ORAL Surveillance study found serious and significant side effects from using Xeljanz, including major adverse cardiovascular events.

6. Despite this negative news about Xeljanz, defendants conditioned the market to believe that Rinvoq, despite also being a JAK inhibitor, was sufficiently different from Xeljanz and that the ORAL Surveillance study was essentially irrelevant. This was, unfortunately, not the case. The FDA announced major label changes to JAK inhibitors, including Xeljanz and Rinvoq, and stated that Rinvoq's approved usage was limited to those adults with RA that had an inadequate response to other drugs.

7. In the wake of this disclosure, AbbVie's market capitalization plunged by over $15 billion. Further, as a direct result of this unlawful course of conduct, AbbVie is now the subject of at least one federal securities class action lawsuit in this District on behalf of investors who purchased AbbVie stock.

8. In addition, these false statements were only made possible as a result of the Company's lax corporate governance. Stockholders have recognized this problem, as AbbVie has been sued for such notable legal failures as violating antitrust laws. These concerned stockholders asked for the Company's fellow stockholders to vote to separate AbbVie's role of CEO and Chairman of the Board of Directors (the "Board"), and thereby include AbbVie's governance. The Board, however, urged stockholders to reject the proposal. In doing so, the Board made a series of false statements about its oversight and passed those off as fact in violation of federal securities laws. With this backdrop, the Company's stockholders rejected the stockholder proposal.

9. Accordingly, plaintiff now seeks to hold defendants accountable for their false and misleading statements and the harm they caused to AbbVie.

## JURISDICTION AND VENUE

10.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violation of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

11.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) AbbVie maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to AbbVie, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

13.     Plaintiff Treppel Family Trust was a stockholder of AbbVie at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current AbbVie stockholder.

**Nominal Defendant**

14.    Nominal Defendant AbbVie is a Delaware corporation with principal executive offices located at 1 North Waukegan Road, North Chicago, Illinois.  AbbVie is a global, research-based biopharmaceutical company which develops and markets advanced therapies that address some of the world's most complex and serious diseases.  AbbVie was incorporated in Delaware on April 10, 2012.  On January 1, 2013, AbbVie became an independent, publicly-traded company as a result of the distribution by Abbot Laboratories of 100% of the outstanding common stock of AbbVie to Abbott Laboratories' stockholders.

**Defendants**

15.    Defendant Richard A. Gonzalez ("Gonzalez") has been AbbVie's CEO, Chairman of the Board, and director since January 2013.  Defendant Gonzalez is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  AbbVie paid defendant Gonzalez the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Non-qualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|--------------------------------------------------------------------------|------------------------|-------|
| 2021 | $1,700,000 | $12,573,689 | $3,134,649 | $4,908,750 | $780,993 | $814,073 | $23,912,154 |
| 2020 | $1,688,462 | $11,644,996 | $2,781,662 | $4,908,750 | $2,224,135 | $759,586 | $24,007,591 |

16.    Defendant Michael E. Severino ("Severino") has been AbbVie's Vice Chairman and President since December 2018.  Defendant Severino was also AbbVie's Chief Scientific Officer, Executive Vice President, Research and Development from May 2014 to December 2018. Defendant Severino is named as a defendant in a related securities class action complaint that

alleges he violated sections 10(b) and 20(a) of the Exchange Act. AbbVie paid defendant Severino the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Non-qualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| 2021 | $1,411,031 | $4,258,823 | $1,061,733 | $2,700,000 | $1,437,307 | $181,026 | $11,049,920 |
| 2020 | $1,369,923 | $5,822,401 | $1,390,831 | $2,700,000 | $1,910,985 | $216,918 | $13,411,058 |

17. Defendant Robert A. Michael ("Michael") has been AbbVie's Vice Chairman, Finance and Commercial Operations since December 2021 and Chief Financial Officer since October 2018. Defendant Michael was also Executive Vice President from October 2018 to December 2021; Vice President, Controller from March 2017 to October 2018; Vice President, Treasurer from 2015 to March 2017;Vice President, Controller, and Commercial Operations from 2013 to 2015; and Vice President, Financial Planning and Analysis from 2012 to 2013. Defendant Michael is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. AbbVie paid defendant Michael the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Non-qualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| 2021 | $1,129,881 | $4,258,823 | $1,061,733 | $2,630,000 | $2,525,840 | $61,389 | $11,667,666 |
| 2020 | $1,065,385 | $5,406,515 | $1,291,477 | $2,110,000 | $3,571,858 | $49,394 | $13,494,629 |

18. Defendant Jeffrey R. Stewart ("Stewart") has been AbbVie's Executive Vice President, Chief Commercial Officer since March 2021. Defendant Stewart was also Senior Vice President, U.S. Commercial Operations from 2018 to March 2021; and President, Commercial Operations from 2013 to 2018. Defendant Stewart is named as a defendant in a related securities

class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. AbbVie paid defendant Stewart the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Non-qualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|--------------------------------------------------------------------------|------------------------|-------|
| 2021 | $1,074,231 | $2,839,144 | $707,822 | $2,050,000 | $2,212,898 | $129,001 | $9,013,096 |

19. Defendant Glenn F. Tilton ("Tilton") has been AbbVie's Lead Independent Director and a director since January 2013. Defendant Tilton has been a member of AbbVie's Audit Committee since at least March 2020. AbbVie paid defendant Tilton the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Restricted Stock Unit Awards | All Other Compensation | Total |
|-------------|-------------------|------------------------------|------------------------|-------|
| 2021 | $171,000 | $194,904 | $26,151 | $392,055 |
| 2020 | $168,917 | $194,934 | $30,699 | $394,550 |

20. Defendant Robert J. Alpern ("Alpern") has been an AbbVie director since January 2013. AbbVie paid defendant Alpern the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Restricted Stock Unit Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|-------------|-------------------|------------------------------|--------------------------------------------------------------------------|------------------------|-------|
| 2021 | $115,000 | $194,904 | $36,085 | $25,000 | $370,989 |
| 2020 | $112,917 | $194,934 | $44,483 | $25,000 | $377,334 |

21. Defendant Roxanne S. Austin ("Austin") has been an AbbVie director since January 2013. Defendant Austin was the Chair of AbbVie's Audit Committee and a member of that committee from at least March 2020 to at least March 2021. AbbVie paid defendant Austin the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Restricted Stock Unit Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2021 | $140,583 | $194,904 | $25,000 | $360,487 |
| 2020 | $137,917 | $194,934 | $25,000 | $357,851 |

22.     Defendant William H.L. Burnside ("Burnside") has been an AbbVie director since January 2013.  Defendant Burnside has been a member of AbbVie's Audit Committee since at least March 2020.  AbbVie paid defendant Burnside the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Restricted Stock Unit Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2021 | $121,000 | $194,904 | $25,000 | $340,904 |
| 2020 | $118,917 | $194,934 | $25,000 | $338,851 |

23.     Defendant Frederick H. Waddell ("Waddell") has been an AbbVie director since November 2012.  Defendant Waddell has been a member of AbbVie's Audit Committee since at least March 2020.  AbbVie paid defendant Waddell the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Restricted Stock Unit Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2021 | $121,000 | $194,904 | $25,000 | $340,904 |
| 2020 | $118,917 | $194,934 | $26,319 | $340,170 |

24.     Defendant Edward J. Rapp ("Rapp") has been an AbbVie director since January 2013.  Defendant Rapp has been a member of AbbVie's Audit Committee since at least March 2020.  AbbVie paid defendant Rapp the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Restricted Stock Unit Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2021 | $141,000 | $194,904 | $25,000 | $360,904 |
| 2020 | $138,917 | $194,934 | $26,321 | $360,172 |

25.     Defendant Edward M. Liddy ("Liddy") has been an AbbVie director since January 2013.  AbbVie paid defendant Liddy the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Restricted Stock Unit Awards | Total |
|---|---|---|---|
| 2021 | $123,333 | $194,904 | $318,237 |
| 2020 | $132,917 | $194,934 | $327,851 |

26.     Defendant Brett J. Hart ("Hart") has been an AbbVie director since May 2016.

AbbVie paid defendant Hart the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Restricted Stock Unit Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2021 | $135,000 | $194,904 | $25,000 | $354,904 |
| 2020 | $132,917 | $194,934 | $25,000 | $352,851 |

27.     Defendant Melody B. Meyer ("Meyer") has been an AbbVie director since May

2017.  Defendant Meyer has been a member of AbbVie's Audit Committee and has been since at

least March 2020.  AbbVie paid defendant Meyer the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Restricted Stock Unit Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2021 | $121,000 | $194,904 | $25,000 | $340,904 |
| 2020 | $118,917 | $194,934 | $25,000 | $338,851 |

28.     Defendant Rebecca B. Roberts ("Roberts") has been an AbbVie director since May

2018.  AbbVie paid defendant Roberts the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Restricted Stock Unit Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2021 | $115,000 | $194,904 | $25,000 | $334,904 |
| 2020 | $112,917 | $194,934 | $25,000 | $332,851 |

29.     Defendant Thomas C. Freyman ("Freyman") has been an AbbVie director since

May 2020.  Defendant Freyman was also an AbbVie director from November 2012 to January

2013.  Defendant Freyman has been Chair of AbbVie's Audit Committee since at least March

2022.  AbbVie paid defendant Freyman the following compensation as a director:

- 9 -

| Fiscal Year | Fees Paid in Cash | Restricted Stock Unit Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2021 | $129,583 | $194,904 | $25,000 | $349,487 |
| 2020 | $67,083 | $194,934 | - | $262,017 |

30.     The defendants identified in ¶¶15-18 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶15, 19-29 are referred to herein as the "Director Defendants."  Collectively, the defendants identified in ¶¶15-29 are referred to herein as the "Individual Defendants."

<u>**DUTIES OF THE INDIVIDUAL DEFENDANTS**</u>

**Fiduciary Duties**

31.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe AbbVie and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage AbbVie in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of AbbVie and not in furtherance of their personal interest or benefit.

32.     To discharge their duties, the officers and directors of AbbVie were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of AbbVie were required to, among other things:

(a)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(b)    remain informed as to how AbbVie conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

33.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of AbbVie, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

34.    The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to engage in improper practices that wasted the Company's assets, and caused AbbVie to incur substantial damage.

35.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of AbbVie, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, AbbVie has expended, and will continue to expend, significant sums of money.

## COMPARABLE JAK INHIBITORS STRUGGLE FOR FDA APPROVAL

36.    RA is an autoimmune disease.  RA occurs when a person's immune system attacks healthy cells by mistake, causing inflammation in the affected parts of the body.

37.     Ulcerative colitis is a chronic inflammatory bowel disease.  It occurs when abnormal reactions of the immune system cause inflammation and ulcers on the inner lining of the large intestine.

38.     Rinvoq is a JAK inhibitor.  JAK are types of enzymes that transduce signals in the body, which can cause inflammation within the body.  JAK inhibitors work by reducing the activity of one or more JAK, preventing the over-activity in the immune system that contributes to RA and ulcerative colitis.

39.     JAK inhibitors are not new drugs.  The FDA approved Pfizer's JAK inhibitor, Xeljanz, in 2012 for the treatment of adults with RA that did not respond well to the medicine methotrexate.  In 2018, the FDA approved Xeljanz for the treatment of ulcerative colitis.

40.     The FDA, however, also required that Pfizer conduct additional safety trials on Xeljanz, known as the ORAL Surveillance study.  On February 25, 2019, the FDA announced that the ORAL Surveillance study found an increased risk of blood clots in lungs and death when RA patients used Xeljanz.  On January 26, 2019, the FDA approved new warnings about the increased risk of blood clots and death in connection with the use of the 10mg twice daily dose of Xeljanz for treatment of ulcerative colitis.

41.     On February 4, 2021, the FDA alerted the public that the preliminary results from the ORAL Surveillance study "show an increased risk of serious heart-related problems and cancer" from the use of Xeljanz and Xeljanz XR compared to competitor treatments.

**DEFENDANTS MISLEAD THE MARKET ABOUT RINVOQ**

42.     The market was rightly concerned about AbbVie's potential blockbuster/Humira replacement, Rinvoq, in light of Xeljanz's safety issues.  However, defendants presented Xeljanz's safety issues as unique to that drug and not indicative of JAK inhibitors in general.

43. In particular, on April 30, 2021, the Company held a conference call with analysts and investors to discuss its financial results for the first quarter of the 2021 fiscal year. Analysts were interested in what the recent news from the FDA on Xeljanz meant for Rinvoq. Defendant Stewart stated, "What we have heard is when we do some of our research and our ear to the ground, we clearly see that oral surveillance is perceived as a Xeljanz issue."

44. During that same call, defendants Gonzalez and Severino also discussed expanding Rinvoq's use to additional treatments. In particular, defendant Gonzalez stated:

> I'm also extremely pleased with our R&D prospects, including the number and potential of the opportunities, especially within our late-stage pipeline. We're on the cusp of the potential commercial approval of more than a dozen new products or indications over the next 2 years, including … expanded indications for Rinvoq in psoriatic arthritis, ankylosing spondylitis and atopic dermatitis.

45. In particular, defendant Severino stated:

> Our regulatory submissions are currently under review for Rinvoq in 3 new indications in the U.S., ankylosing spondylitis, psoriatic arthritis and atopic dermatitis. As we previously announced, the FDA recently extended the review period for Rinvoq in psoriatic arthritis and atopic dermatitis, following a request for an updated assessment of the benefit-risk profile for Rinvoq in these indications. In response to the FDA request, we provided updated data from across Rinvoq programs in RA, psoriatic arthritis and atopic dermatitis. Based on the review extensions, we now expect approval decisions for psoriatic arthritis in June and for atopic dermatitis in July. The regulatory action date for Rinvoq in ankylosing spondylitis is unchanged and remains on track for June. ***We remain confident in the benefit-risk profile of Rinvoq across all indications, and we'll work with the FDA to bring Rinvoq to market in these new disease areas***.

46. On May 25, 2021, defendants Stewart, Severino, and Michael presented on behalf of AbbVie at the UBS Global Healthcare Virtual Conference. During the conference, defendant Severino implicitly acknowledged the overlap between Xeljanz and Rinvoq, while also claiming Rinvoq was safer. In particular, he stated:

> With respect to the label, I think it's early to speculate, we don't know what XELJANZ labeling will look like and that is obviously a key component of the story. But what I would say is, we remain very confident in the data that we've generated for RINVOQ. We have a very large data set, more than 10,000 patient

years of follow-up. We have long-term randomized data, and we know that those randomized data, controlled data are the most impactful, with the agency when looking at safety questions like the ones that they're examining, we have 3-year data in RA. We have 1-year data in psoriatic arthritis. We have large safety databases across all of the indications that we are pursuing.

And those data have not shown a signal with our agent, with RINVOQ, for the adverse experiences that are being evaluated with XELJANZ and with others. Specifically, we've not seen increased rates of VTE or PE. We've not seen increased rates of cardiovascular events or MACE events, and we've not seen increased risk for malignancy. And if you look at the track record here, we've been very successful in getting our data into the label so they're well understood by prescribing physicians.

And if one looks at the RA launch, we had our data in the label for RA, both our efficacy and our safety data. I think they well characterize the benefit risk of the molecule in that launch. Performed very well. In fact, it exceeded our expectations, so we feel good about the opportunities that are in front of us for psoriatic arthritis, for atopic dermatitis and ankylosing spondylitis, which are the indications that are under review. And of course, we have more indications that are still in Phase III and we feel confident in those as well.

47.     On June 2, 2021, defendants Severino and Michael presented on behalf of AbbVie at the Sanford C. Bernstein Strategic Decisions Virtual Conference.  In response to an analyst's question, defendant Severino stated that Xeljanz's issues were unique to that drug and implied that Rinvoq's performance was improving due to physicians moving away Xeljanz.  In particular, the following exchange took place:

[Analyst]: Okay. So the other question is the impact of all this debate on physician behavior. Within RA, are we seeing patients -- are you seeing physician gradually moving away from XELJANZ? Is there a moving towards RINVOQ away from XELJANZ as a result of the heightened safety concern around XELJANZ?

[Defendant Severino]:  Well, in the RA market, what we see is RINVOQ continues to perform very strongly. And its trajectory continues along a path that we would expect. So the XELJANZ issue seems to be viewed by the prescribing community as specific to XELJANZ. So you see a change in the XELJANZ performance, but RINVOQ's performance has continued. And since...

[Analyst]: Yes. Have you gained from the XELJANZ's problems?

[Defendant Severino]:  Well, we've continued to grow and so we're picking up patients from a variety of sources. We're picking up patients from many other

therapies. It's hard to say what a doc would have prescribed 6 months ago versus what they're prescribing today, but we're continuing to gain and our in-play share is very strong.

48. Defendant Severino also claimed that the Company was moving forward and expected FDA approval on using Rinvoq for the treatment of atopic dermatitis. In particular, the following exchange took place:

[Defendant Severino]: So the PDUFA date for the atopic derm indication, which is I assume the indication that you're referring to, had been April and it moved 3 months so it's now in July. So early in the third quarter. And we feel like we are making appropriate progress with the -- our ability to provide answers to the FDA, provide them the data that they have requested, and we feel good about the overall progress we're making there. And we feel very confident in that overall profile and our ability to gain an approval in that indication.

With respect to an AdCom, I don't think an AdCom is likely at all. And the reason for that is that if the FDA were planning an AdCom, they would already be setting that in motion. We would absolutely expect them to have reached out to us. We'd expect them to be deep in preparation for an AdCom and they're not. So while they still have the authority to do that, it seems very unlikely that they will for that simple reason. And if you look at their track record here, they have made these decisions on their own, based on their own review of the data in this class, pretty consistently.

If you look at the RINVOQ RA application, that was in review at the time that the baricitinib, DVT, PE issue came to light. And there was speculation at that time that there would be an AdCom before they could act on the RA application. And there was not. The FDA made their decision based on the data that we provided them and based on their own review of those data. And the outcome there was a good one and the label that we achieved was a good one. And it supported the very robust launch in RA that quite frankly exceeded our expectations and I think exceeded expectations broadly speaking.

[Analyst]: Okay. So the obvious question is, are we at the -- is there still a go, a back-and-forth in things like the label language? Is the overall review still progressing with the exception of that question of the safety profile of the class? Or is this kind of done and that's the last gating factor? Or is everything delayed and will we start somewhere in June? Can I -- can you give us a little bit more color on this?

[Defendant Severino]: I would say that the review of the file is progressing in a way that's very consistent with our expectations. We -- we're asked in April to supply some additional data. We supplied those data. We viewed the data as supportive of our overall application and very consistent with everything that we've

said about product safety and efficacy. And I would say that the file is progressing as we would have expected.

[Analyst]: A kind of like label discussion at this point or close enough to closing the last gaps in what needs to get done before approval. Is that kind of like the overall picture?

[Defendant Severino]: Yes. I mean we usually don't comment on the specifics of exact label discussions until they're finalized. But I would say we're making the progress that we would expect and we believe we're on track for an approval on the new PDUFA date.

49.     At the Goldman Sachs Global Healthcare Virtual Conference held on June 8, 2021, defendant Severino again claimed that there were notable differences between Xeljanz and Rinvoq when it came to both efficacy and safety. In particular, he stated:

Well, we certainly have seen differences in JAKs with respect to performance and with respect to a number of safety issues, if you look across the class. And while people talk about the JAK class in aggregate, there are very significant differences in specificity for JAK type, and those can drive real differences in performance, both from a safety and an efficacy perspective. And we've consistently had very strong data in both perspectives.

Obviously, most of the attention now comes after the results of the XELJANZ oral surveillance study and the results that were demonstrated there on MACE and malignancy. So failing to clear their safety boundary for those 2 events in a study that was a post-marketing requirement, going way back to their original approval.

What I would say there is we've looked for those events very carefully within our program. We have a large database. We have more than 10,000-patient years' experience in our clinical trials database that we have examined for these events. We adjudicate these events. We have very rigorous methods to try to make sure that we are capturing all events that are occurring. And those databases have not shown a signal for increased risk. And that's true whether you look compared to baseline rates or within the controlled portions of those programs where you have long-term control data against Humira, principally, and other agents as well. We've not shown evidence of increased risk for MACE, for malignancy, for DVT and PE. So we feel confident in the profile that we've described.

And I think it's challenging to predict how they will come down on labeling across each member of the class. But what I would say is we have been successful in making sure that our data are reflected in our label, and that's been well understood by prescribing physicians. And if you go back, as an analogy, if you will, to the RA approval, which occurred right around the time that the DVT and PE issue was the focus for baricitinib, we had data in our label that described our experience. Those

data were well understood by physicians, and the uptake has been very robust in that indication. And so I think we're in a very similar position here.

## THE TRUTH EMERGES

50.    Despite defendants' claims above, the FDA did not view the problems revealed in the ORAL Surveillance study as just a "Xeljanz issue."  Rather, on June 25, 2021, the Company announced that the FDA would not complete its review of using Rinvoq for treatment of psoriatic arthritis and ankylosing spondylitis because of "its ongoing review of Pfizer's post-marketing study, ORAL Surveillance."  AbbVie announced the FDA extended its review on July 16, 2021.

51.    Defendants downplayed the meaning of the FDA's delay and continued review of the ORAL Surveillance study.  On the Company's second quarter 2021 earnings conference call held on July 30, 2021, defendant Severino stated:

> The FDA has not requested any additional safety analysis for RINVOQ since the PDUFA dates were missed. While there are no new action dates, based on our discussions with the agency, we expect decisions on our regulatory applications in the next few months following completion of the agency's review of the tofacitinib oral surveillance data. We remain confident in the benefit risk profile for RINVOQ across all indications, and we'll continue to work with the FDA to bring RINVOQ to market in these new disease areas.

52.    During the same call, defendant Stewart stated:

> We are anxiously awaiting the resolution here of oral surveillance, which obviously has delayed our regulatory submissions, but it's not outside of the realm of possibility given the very significant differentiated data that we have in our packages that we could see an acceleration as things resolve.

53.    On September 1, 2021, the FDA announced that the final results of the ORAL Surveillance study.  It found that even at lower doses Xeljanz was associated with "an increased risk of serious heart-related events such as heart attack or stroke, cancer, blood clots, and death." The FDA ordered "new and updated warnings" for Xeljanz.  However, the FDA did not stop there. The FDA explained that "since they share mechanisms of action with Xeljanz," it would also require updated warnings for other JAK inhibitors, most notably Rinvoq.  The FDA also explained

going forward it would only approve Rinvoq (and Xeljanz) use for "certain patients who have not responded [to] or cannot tolerate one or more [tumor necrosis factor] blockers."

54.     The FDA's announcement effectively killed any chance of Rinvoq becoming AbbVie's next big drug and replacing Humira.  Investors noticed.  That day the Company's market capitalization fell over $15 billion.

55.     On December 3, 2021, AbbVie revealed the updated label for Rinvoq.  It was as bad as feared.  In particular, the Company stated:

> [T]he U.S. label for RINVOQ will now include additional information about the risks of malignancy and thrombosis, and the addition of mortality and MACE (defined as cardiovascular death, myocardial infarction and stroke) risks within the Boxed Warnings and Warnings and Precautions sections. The indication has also been updated to the following: RINVOQ is indicated for the treatment of adults with moderately to severely active rheumatoid arthritis who have had an inadequate response or intolerance to one or more TNF blockers.

## REASONS THE STATEMENTS WERE IMPROPER

56.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)     Rinvoq was sufficiently similar to Xeljanz as a JAK inhibitor that the FDA would find the safety concerns from the ORAL Surveillance study also applied to Rinvoq;

(b)     the FDA would require significant safety warnings for Rinvoq in light of the ORAL Surveillance study; and

(c)     the FDA would delay approval of any additional treatment uses of Rinvoq in light of safety concerns.

## THE FALSE AND MISLEADING PROXY

57.     Defendants Alpern, Austin, Burnside, Tilton, Waddell, Rapp, Liddy, Hart, Meyer, Roberts, Freyman, and Gonzalez breached their fiduciary duties and violated section 14(a) of the

Exchange Act by making false and misleading statements while recommending stockholders make certain votes. In particular, on March 22, 2021, defendants Alpern, Austin, Burnside, Tilton, Waddell, Rapp, Liddy, Hart, Meyer, Roberts, Freyman, and Gonzalez caused AbbVie to file with the SEC its Proxy Statement in connection with the 2021 Annual Meeting of Stockholders (the "Proxy"). The Proxy solicited stockholder votes on AbbVie's amended and restated 2013 incentive stock program and on having an independent Chair of the Board. The Board recommended voting for the amended and restated 2013 incentive stock program and against having an independent Chair of the Board.

58. In recommending that stockholders vote in favor of the amended and restated 2013 incentive stock program, the Board claimed that the equity awards "align the interests of our employees, officers and non-employee directors with those of other stockholders." In particular, the Proxy stated:

> The purpose of the Amended Plan is to attract and retain outstanding employees, officers, and non-employee directors of AbbVie and its subsidiaries and to motivate such individuals by providing opportunities to acquire AbbVie shares of common stock or to receive payments based on the value of such shares or on the financial performance of AbbVie, or both, on advantageous terms and to further align such persons' interests with those of AbbVie's other stockholders.

59. The Proxy also stated:

> **Equity incentives align the interests of our employees, officers and non-employee directors with those of other stockholders.** AbbVie believes that equity incentives motivate recipients to focus on behaviors that, over time, lead to sustained growth in stockholder value.

60. The Proxy also stated:

- AbbVie does not include certain pay design features that may have the potential to encourage excessive risk-taking, such as: over-weighting toward annual incentives, highly leveraged payout curves, unreasonable thresholds or dramatic changes in payout opportunity at certain performance levels that may encourage inappropriate short-term business decisions to meet payout thresholds. In addition, a limit of 200% of target applies to any awards made under the NEO short-term incentive plan.

- AbbVie's long-term incentive program focuses NEOs on longer-term operating performance and aligns NEOs with stockholder interests through the use of multi-year performance periods and multiple performance measures, including relative total stockholder return.

61.     These statements were untrue.  The material terms of the performance goals in the amended and restated 2013 incentive stock program did not encourage proper risk oversight, nor advance long-term stockholder value. For example, by focusing on total stockholder return, the amended and restated 2013 incentive stock program incentivizes executives to mislead the market to inflate the Company's stock price.

62.     Certain stockholders proposed that AbbVie adopt a policy and amend its bylaws as necessary to require that the Chairman of the Board is an independent director, as opposed to the CEO.  The stockholders explained: "In light of rising material legal, regulatory, financial and reputational risks, as well as the controversies and legal challenges facing the company we are concerned that the Board is not providing the necessary oversight of the company's culture, strategy, and risk management."

63.     The Board recommended that stockholders vote against the stockholder proposal due, at least in part to its claim that:

> AbbVie has other robust corporate governance practices designed to protect long-term shareholder value. … Other corporate governance practices, which are highlighted in our Governance Guidelines (available at www.abbvieinvestor.com) and throughout this proxy statement, include a comprehensive board risk management oversight process[.]

64.     Other statements concerning the Company's corporate governance contained in the Proxy included: "Our board of directors is committed to strong corporate governance tailored to meet the needs of AbbVie and its stockholders to enhance long-term stockholder value."

65.     The Proxy also explicitly referenced AbbVie's corporate governance guidelines and policies located at its website, stating:

AbbVie's corporate governance guidelines with the outline of directorship qualifications; director independence guidelines; code of business conduct; and audit committee, compensation committee, nominations and governance committee, and public policy committee charters are all available in the corporate governance section of AbbVie's investor relations website at www.abbvieinvestor.com.

66.     The website explicitly referenced in the Proxy leads stockholders to a "Code of Business Conduct."  This Code claims that AbbVie "follow[s] industry laws and regulations"; "maintain[s] high standards in research & development" and "maintain[s] trustworthy business practices"; and "communicate[s] with the public appropriately."

67.     The Code also stated:

We maintain trustworthy business practices

We comply with all applicable laws that regulate our business.

We conduct our business in a transparent and ethical manner and comply with all applicable laws.

*    *    *

We communicate with the public appropriately

It is a privilege to share the pride of our accomplishments with the world. When we share information, the public expects us to be consistent and accurate.

68.     These statements were untrue as, explained above, AbbVie was misleading the market about Rinvoq, its safety, the drug's similarities to Pfizer's JAK inhibitor, and the likelihood of FDA action on Rinvoq.

69.     On May 5, 2021, AbbVie held its Annual Meeting of Stockholders.  As a direct result of the misleading statements, the Company's stockholders approved the amended and restated 2013 incentive stock program and did not approve the stockholder proposal for a policy where the Chairman of the Board is an independent director.

## DAMAGES TO ABBVIE

70.     As a result of the Individual Defendants' improprieties, AbbVie disseminated improper, public statements concerning the safety of Rinvoq, the drug's labeling, and the likelihood that the FDA approved the use of Rinvoq for additional indications.  These improper statements have devastated AbbVie's credibility as reflected by the Company's $15 billion market capitalization loss.

71.     Further, as a direct and proximate result of the Individual Defendants' actions, AbbVie has expended, and will continue to expend, significant sums of money, including the costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

72.     Plaintiff brings this action derivatively in the right and for the benefit of AbbVie to redress injuries suffered, and to be suffered, by AbbVie as a direct result of breaches of fiduciary duty and violation of securities law, as well as the aiding and abetting thereof, by the Individual Defendants.  AbbVie is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

73.     Plaintiff will adequately and fairly represent the interests of AbbVie in enforcing and prosecuting its rights.

74.     Plaintiff was a stockholder of AbbVie at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current AbbVie stockholder.

75.     The current Board of AbbVie consists of the following twelve individuals: defendants Gonzalez, Alpern, Austin, Burnside, Freyman, Hart, Liddy, Meyer, Rapp, Roberts,

Tilton, and Waddell. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Gonzalez, Alpern, Austin, Burnside, Freyman, Hart, Liddy, Meyer, Rapp, Roberts, Tilton, and Waddell Face a Substantial Likelihood of Liability for Their Misconduct**

76.     As alleged above, defendants Gonzalez, Alpern, Austin, Burnside, Freyman, Hart, Liddy, Meyer, Rapp, Roberts, Tilton, and Waddell breached their fiduciary duties of loyalty and violated securities laws by making improper statements in the Company's SEC filings, including the Proxy.

77.     In addition, each director breached their duty of oversight by allowing the above false statements about a core product for the Company, Rinvoq, the potential replacement for Humira.

## COUNT I

**Against the Individual Defendants for Breach of Fiduciary Duty**

78.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

79.     The Individual Defendants owed and owe AbbVie fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe AbbVie the highest obligation of care and loyalty.

80.     The Individual Defendants and each of them, violated and breached their fiduciary duties.

81.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, AbbVie has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

82.     Plaintiff, on behalf of AbbVie, has no adequate remedy at law.

## COUNT II

**Against the Director Defendants for Violation of Section 14(a) of the Exchange Act.**

83.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

84.    The Director Defendants issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the Proxy.  By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, the Director Defendants misled and/or deceived its stockholders by making misleading statements that were essential links in stockholders heeding AbbVie's recommendation to vote in favor of the amended and restated 2013 incentive stock program and against separating the Chairman of the Board from the CEO.

85.    The misleading information contained in the Proxy was material to AbbVie stockholders.  The Proxy solicitation process in connection with the Proxy were essential links in the approval of the amended and restate 2013 incentive stock program and the disapproval of splitting the Chairman of the Board from the CEO.

86.    Plaintiff, on behalf of AbbVie, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxy in connection with the improper reelection of the members of the Board.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of AbbVie, demands judgment as follows:

A.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties and violations of securities law;

B.     Directing AbbVie to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect AbbVie and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

    1.     a proposal to strengthen AbbVie's oversight of its disclosure procedures;

    2.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

    3.     a provision to permit the stockholders of AbbVie to nominate at least three candidates for election to the Board;

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of AbbVie has an effective remedy;

D.     Awarding to AbbVie restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated:  May 23, 2022

TREPPEL FAMILY TRUST, Derivatively on Behalf of ABBVIE INC.,

By:  s/Michael K. Forde
One of Its Attorneys

Michael K. Forde
Brian P. O'Meara
FORDE & O'MEARA LLP
191 North Wacker Drive, 31st Floor
Chicago, IL 60606
(T) 312.641.1441
(F) 312.465.4801
mforde@fordellp.com
bomeara@fordellp.com

Brian J. Robbins*
Stephen J. Oddo*
Eric M. Carrino*
ROBBINS LLP
5040 Shoreham Place
San Diego, CA 92122
(T) 619.525.3990
(F) 619.525.3991
brobbins@robbinsllp.com
soddo@robbinsllp.com
ecarrino@robbinsllp.com

Attorneys for Plaintiff

*Pro hac vice forthcoming

## <u>VERIFICATION</u>

I, Lawrence Treppel, hereby declare as follows:

I am the Trustee of the Treppel Family Trust, the plaintiff in this action. I have read the verified stockholder derivative complaint on behalf of AbbVie Inc. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: <u>5/19/2022</u>

DocuSigned by:

*Larry Treppel*

7878E0AEF41742A... LAWRENCE TREPPEL