UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TREPPEL FAMILY TRUST and JOANNE
KATCHER, derivatively on behalf of
nominal defendant ABBVIE, INC.,

      Plaintiffs,

      v.

RICHARD A. GONZALEZ, et al.,

      Defendants,

     and

ABBVIE INC.,

      Nominal Defendant.

No. 22 CV 2718

Judge Georgia N. Alexakis

## MEMORANDUM OPINION AND ORDER

The Treppel Family Trust and Joanne Katcher ("plaintiffs"), representing shareholders in AbbVie Inc. ("AbbVie"), have brought this consolidated shareholder derivative action on behalf of nominal defendant AbbVie.[1] Plaintiffs allege that 15 individual AbbVie officers and/or directors breached their fiduciary duties to AbbVie in 2021 in connection with AbbVie's marketing of the drug Rinvoq; and that 12 of these 15 defendants further violated § 14(a) of the Securities Exchange Act of 1934 by including materially false and misleading statements in a 2021 proxy statement.

---

[1] Plaintiff Treppel Family Trust filed its original complaint in May 2022. [1]. Plaintiff Joanne Katcher filed a related complaint in July 2022. *See Katcher v. Gonzalez*, 1:22-cv-03459 (N.D. Ill.). In September 2022, the Court previously assigned to this matter granted both plaintiffs' motion to consolidate given the "substantively identical" and "overlapping" nature of the allegations, claims, and defendants. [26] ¶ 3; [27]; [38]. Plaintiffs filed their consolidated amended complaint—the operative complaint now at issue—in October 2022. [44].

Plaintiffs also bring claims for contribution and indemnification as well as for unjust enrichment against each named defendant.

All defendants, including nominal defendant AbbVie, have moved to dismiss the complaint in its entirety. [45]. Because plaintiffs have not adequately alleged that presentation of their demands to AbbVie's board of directors would have been futile, defendants' motion is granted and plaintiffs' operative complaint is dismissed, although without prejudice.

## I.    Factual Background

The following facts are taken from plaintiffs' operative complaint.[2] AbbVie is a large pharmaceutical company headquartered in North Chicago, Illinois. [44] ¶¶ 1, 33. At filing, more than one third of AbbVie's net revenue came from Humira (brand name for adalimumab), an anti-inflammatory drug used to treat rheumatoid arthritis, among other things. *Id.* ¶ 1; *see also id.* ¶ 33. Humira's patent protections expired in 2023, which plaintiffs anticipated would negatively affect AbbVie's revenue. *Id.* ¶¶ 2–3, 34–35.

One potential source of new revenue for AbbVie was Rinvoq (brand name for upadacitinib), a newer anti-inflammatory drug. *Id.* ¶¶ 4, 36. Rinvoq works by inhibiting Janus kinase ("JAK") enzymes from acting as a pathway for cytokines and was initially approved to treat moderate to severe rheumatoid arthritis. *Id.* ¶¶ 4, 36. But in 2020 AbbVie requested approval from the Food and Drug Administration

---

[2] At this stage, the Court accepts all factual allegations in the complaint as true. *See Emerson v. Dart*, 109 F.4th 936, 941 (7th Cir. 2024) (quoting *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013)).

("FDA") for Rinvoq's use to treat other inflammatory diseases, including psoriatic arthritis, ankylosing spondylitis, and atopic dermatitis. *Id.* ¶¶ 5, 36.

The FDA had by then required that another FDA-approved JAK inhibitor, Pfizer's Xeljanz, go through an additional safety trial. *Id.* ¶¶ 38–39. Based on that trial's preliminary results, the FDA issued warnings in 2019 and 2021 that rheumatoid arthritis patients taking Xeljanz were at risk of serious side effects such as blood clots in the lungs and death. *Id.* Because of their shared mechanism of action, the FDA ultimately required updated warnings for both Xeljanz and Rinvoq and indicated that it would limit any expansion in Rinvoq's use because of the safety concerns from the Xeljanz trial. *Id.* ¶¶ 9, 64.

A.    **Defendants' Statements About Rinvoq**

One of plaintiffs' core allegations is that defendants made, or allowed to be made, statements that created the false impression that Rinvoq would not face the same safety concerns and regulatory issues as Xeljanz and, therefore, that sales of Rinvoq would help mitigate the loss of revenue to AbbVie from Humira's expiring patent protections. *Id.* ¶¶ 41–48, 72–79, 93. According to plaintiffs, this false impression resulted in both a $15-billion loss in AbbVie's market capitalization and a (now-dismissed) federal securities class action. *Id.* ¶ 10; *see also Nakata v. AbbVie*, No. 1:22-cv-01773 (N.D. Ill.).[3]

---

[3] Plaintiff voluntarily dismissed the *Nakata* action without prejudice in February 2023. *See Nakata*, No. 1:22-cv-01773 (N.D. Ill.) [24]; Fed. R. Civ. P. 41(a)(1)(A)(i).

The statements at issue were made between April 30, 2021, and July 30, 2021. [44] ¶¶ 41–47. As detailed next, the statements were made by Richard A. Gonzalez, AbbVie Board Chair and Chief Executive Officer; Michael E. Severino, Vice Chairman and President; Robert A. Michael, Vice Chairman and Chief Financial Officer; and Jeffrey R. Stewart, Executive Vice President and Chief Commercial Officer. *Id.* In addition to being named as defendants in this action, Gonzalez, Severino, Michael, and Stewart were named as defendants in the *Nakata* class action as well. *Id.* ¶¶ 17–20.[4]

On April 30, 2021, AbbVie held a conference call with analysts and investors discussing its first quarter financial results. *Id.* ¶ 41. In response to questions about what FDA action on Xeljanz meant for Rinvoq, defendant Stewart stated that based on "our research and ear to the ground, we clearly see that [the Xeljanz safety trial] is perceived as a Xeljanz issue." *Id.* On the same call, Gonzalez said that he was "extremely pleased with [AbbVie's] R&D prospects" including "expanded indications for Rinvoq in psoriatic arthritis, ankylosing spondylitis and atopic dermatitis," which he described as "on the cusp of [] potential commercial approval." *Id.* ¶ 42. Severino further said that AbbVie "expect[ed] approval decisions" for those new Rinvoq indications in June and July of 2021, and that AbbVie "remain[ed] confident in the benefit-risk profile of Rinvoq across all indications, and we'll work with the FDA to bring Rinvoq to market in these new disease areas." *Id.* ¶ 43.

---

[4] Plaintiffs sometimes refer to these four defendants as the "Officer Defendants." [44] ¶ 32. Plaintiffs sometimes refer to Gonzalez and the 11 other defendants—each of whom occupied a seat on AbbVie's board of directors—as the "Director Defendants." *Id.* ¶¶ 17, 21–32.

At a virtual healthcare conference on May 25, 2021, Severino said of Rinvoq that "we don't know what Xeljanz labeling will look like and that's obviously a key component of the story." *Id.* ¶ 44. Severino continued: "But . . . we remain very confident in the data that we've generated for Rinvoq" and that "those data have not shown a signal . . . with Rinvoq, for the adverse experiences that are being evaluated with Xeljanz and with others." *Id.* Severino also said that "if you look at the track record here, we've been very successful in getting our data into the label so they're well understood by prescribing physicians" and noted that the Rinvoq launch for rheumatoid arthritis "[p]erformed very well. In fact, it exceeded our expectations, so we feel good about the opportunities that are in front of us for psoriatic arthritis, for atopic dermatitis and ankylosing spondylitis, which are the indications that are under review." *Id.*

On June 2, 2021, at another virtual conference, an analyst asked Severino if patients were moving to Rinvoq because of "the heightened safety concern" around Xeljanz. *Id.* ¶ 45. Severino responded that Rinvoq continued "to perform very strongly" and that "the Xeljanz issue seemed to be viewed by the prescribing community as specific to Xeljanz. So you see a change in the Xeljanz performance, but Rinvoq's performance has continued." *Id.* When asked if AbbVie had "gained from Xeljanz's problems," Severino stated that "we've continued to grow and we're picking up patients from a variety of sources." *Id.* Severino also stated that "we feel good about the overall progress we're making" in getting FDA approval to use Rinvoq for atopic dermatitis, and that "we feel very confident in that overall profile and our

5

ability to gain approval in that indication." *Id.* ¶ 46. Severino also stated that "we're making the progress that we would expect and we believe we're on track for an approval on the new PDUFA date." *Id.*[5]

Next, at another virtual healthcare conference on June 8, 2021, Severino emphasized that "while people talk about the JAK [inhibitor] class in aggregate, there are very significant differences in specificity for JAK [inhibitor] type, and those can drive real differences in performance, both from a safety and an efficacy perspective. And we've consistently had very strong data in both perspectives." *Id.* ¶ 47. Severino again expressed that "we feel confident in the profile we've described" and that "we have been successful in making sure our data are reflected in our label . . . I think we're in a very similar position here." *Id.*

Defendants' optimism notwithstanding, on June 25, 2021, AbbVie announced that the FDA would not complete its review of Rinvoq's use for psoriatic arthritis and ankylosing spondylitis that month—the timeline Severino had predicted at the April 30 conference—because of the ongoing Xeljanz safety testing. *Id.* ¶ 61. And on July

---

[5] In their filings, plaintiffs do not explain the acronym "PDUFA" or the phrase "PDUFA date," but the Court understands this aspect of allegation to mean that Severino represented to investors that AbbVie would receive the anticipated Rinvoq approvals by the deadline for the FDA's review established under the Prescription Drug User Fee Act. 21 U.S.C. § 355(c). In the same paragraph of the complaint, plaintiffs allege that Severino told investors that he did not "think an AdCom is likely at all" and that "if the FDA were planning an AdCom, they would already be setting that in motion." [44] ¶ 46. Again, plaintiffs do not explain the concept of an "AdCom," although the Court understands this aspect of the allegation to mean that Severino represented to investors that AbbVie did not expect the FDA to take the additional step of convening an "advisory committee" to provide independent, expert advice on Rinvoq's safety as part of its review process. *See Learn About FDA Advisory Committees,* https://www.fda.gov/patients/learn-about-fda-advisory-committees.

16, 2021, AbbVie announced that FDA review of Rinvoq's use for atopic dermatitis would also be delayed, again referencing the Xeljanz safety trial. *Id.* ¶ 62.

After these developments, Severino told investors on a July 30, 2021 quarterly earnings call that AbbVie remained "confident in the benefit risk profile for Rinvoq across all indications," that Rinvoq was "very significant[ly] differentiated" from Xeljanz, and that AbbVie "projected $8 billion in Rinvoq sales in 2025." *Id.* ¶ 63.

On September 1, 2021, however, the FDA announced that the Xeljanz trial had shown "an increased risk of serious heart-related events such as heart attack or stroke, cancer, blood clots, and death" even with lower doses, and the FDA would therefore require updated warnings not only for Xeljanz but also for Rinvoq and Olumiant (another JAK inhibitor made by Eli Lilly and Company). *Id.* ¶ 64. The FDA explained that "since they share mechanisms of action with Xeljanz, [the] FDA considers that these medicines may have similar risks as seen in the Xeljanz safety trial." *Id.* Additionally, the FDA would limit further approved uses of all three drugs. *Id.*

According to plaintiffs, the FDA's September 2021 announcement "precluded any chance of Rinvoq becoming AbbVie's next big drug and replacing Humira" and resulted in a $15-billion drop in AbbVie's market capitalization. *Id.* ¶ 65. The updated label went into effect on December 3, 2021, and on January 11, 2022, AbbVie lowered its 2025 revenue projection for Rinvoq from $8 billion to $7.5 billion. *Id.* ¶ 68. Plaintiffs allege that this drop in sales expectations "will have a lasting, negative effect on a critical [AbbVie] revenue source." *Id.*

B.      The 2021 Proxy Statement

Plaintiffs also allege that the Director Defendants, *see supra* at note 4, violated § 14(a) of the federal Securities Exchange Act by making false and misleading statements in a proxy statement, filed on March 22, 2021, specifically by recommending that AbbVie stockholders (1) vote for an amended "incentive stock program" and (2) vote against having an independent chair of the AbbVie board. *Id.* ¶ 49.

Plaintiffs first point to the following text in the proxy statement:

The purpose of the Amended Plan is to attract and retain outstanding employees, officers, and non-employee directors of AbbVie and its subsidiaries and to motivate such individuals by providing opportunities to acquire AbbVie shares of common stock or to receive payments based on the value of such shares or on the financial performance of AbbVie, or both, on advantageous terms and to further align such persons' interests with those of AbbVie's other stockholders.

* * *

Equity incentives align the interests of our employees, officers and nonemployee directors with those of other stockholders. AbbVie believes that equity incentives motivate recipients to focus on behaviors that, over time, lead to sustained growth in stockholder value.

* * *

AbbVie does not include certain pay design features that may have the potential to encourage excessive risk-taking, such as: over-weighting toward annual incentives, highly leveraged payout curves, unreasonable thresholds or dramatic changes in payout opportunity at certain performance levels that may encourage inappropriate short-term business decisions to meet payout thresholds. In addition, a limit of 200% of target applies to any awards made under the NEO[6] short-term incentive plan.

---

[6] Plaintiffs do not explain this acronym, and although the Court does not have an independent understanding of it, the motion to dismiss can be resolved without one.

> AbbVie's long-term incentive program focuses NEOs on longer-term operating performance and aligns NEOs with stockholder interests through the use of multiyear performance periods and multiple performance measures, including relative total stockholder return.

*Id.* ¶¶ 50–51.

Plaintiffs assert these statements were untrue because the incentive stock program did not actually encourage proper risk oversight or improve long-term stockholder value. *Id.* ¶ 52. Instead, by focusing on total stockholder return, plaintiffs allege the incentive stock program motivated AbbVie officers to mislead the market to inflate AbbVie's stock price. *Id.* (Plaintiffs do not precisely allege that AbbVie officers were specifically incentivized by this program to mislead the market about Rinvoq's prospects, although that is a reasonable inference to be drawn from the complaint.)

The proxy statement also recommended that AbbVie stockholders vote against a proposal to require that the chair of AbbVie's board be an independent director rather than AbbVie's CEO. *Id.* ¶ 53. The proxy statement stated an independent chair was unnecessary because AbbVie had "other robust corporate governance practices designed to protect longterm shareholder value," including its code of conduct, director guidelines, the board's audit committee, and AbbVie's avowed commitment to "trustworthy business practices." *Id.* ¶¶ 55–58. Plaintiffs contend these statements were untrue "because AbbVie was misleading the market about Rinvoq, the drug's similarities to Pfizer's JAK inhibitor, and the likelihood of FDA action on Rinvoq." *Id.* ¶ 59. Indeed, according to plaintiffs, the allegedly false statements about Rinvoq

"were only made possible as a result of [AbbVie's] inadequate corporate governance." *Id.* ¶ 11.

As "a direct result of the misleading statements" concerning the advantages of the incentive stock program and the robustness of AbbVie's existing corporate governance, plaintiffs allege that in May 2021, AbbVie stockholders approved the incentive stock program and did not approve the proposal for an independent chair. *Id.* ¶ 60.

## II. Legal Standards

Federal Rule of Civil Procedure 12(b)(6) governs dismissals based on the failure of the complaint to state a claim. A complaint must contain "a short and plain statement" showing that the plaintiff is entitled to relief. Fed. R. Civ. P. 8(a); *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege facts that "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (citation omitted). At this stage, the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiffs' favor, disregarding legal conclusions or "[t]hreadbare recitals" supported by only "conclusory statements." *Iqbal*, 556 U.S. at 678; *see also Emerson*, 109 F.4th at 941.

Because plaintiffs have alleged that defendants engaged in a "fraudulent scheme," *see* [44] ¶ 93, arguably they must satisfy the heightened pleading standard required by Federal Rule of Civil Procedure 9(b). *See Kennedy v. Venrock Associates*, 348 F.3d 584, 593 (7th Cir. 2003). Yet defendants do not advance this argument, and

10

because the Court concludes that plaintiffs fail to satisfy the more generous pleading standard under Rule 12(b)(6), it does not address the potential applicability of Rule 9(b).

## III.   Analysis

### A.   Demand Futility

AbbVie is incorporated in Delaware, [44] ¶ 16, where state law generally requires that a company's "business and affairs . . . be managed by or under the direction of a board of directors" rather than by shareholders. 8 Del. C. § 141(a); *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1047 (Del. 2021) (director management "a cardinal precept" of Delaware law). Because a shareholder derivative suit "seeks to displace" the board's control, Delaware law requires that before shareholders bring such an action in court, they first must make their demands on the company's board unless such a demand would be futile. *Zuckerberg*, 262 A.3d at 1047. The parties both note that Federal Rule of Civil Procedure 23.1 outlines pleading requirements for a shareholder derivative action brought in federal court, and the parties agree that Delaware state law controls whether the shareholder demand is adequate or excused. *See Kamen v. Kemper Fin.*, 500 U.S. 90, 98–99 (1991); [46] at 6; [51] at 7.

The parties further agree that the three-part test to assess demand futility laid out by the Supreme Court of Delaware in *Zuckerberg* applies. [46] at 6; [51] at 7–8. *Zuckerberg* instructs that demand is futile if at least half the board members (1) "received a material personal benefit from the alleged misconduct that is the subject

11

of the litigation demand"; (2) "face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand"; or (3) "lack[] independence from someone who received a material personal benefit from the alleged misconduct that is the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand." *Zuckerberg*, 262 A.3d at 1058–59.

Plaintiffs concede that they did not file a pre-suit demand with AbbVie asking its directors to initiate this action. [44] ¶¶ 12, 85. According to plaintiffs, they were excused from doing so because "more than half the [board] members would be interested in a demand to investigate their own wrongdoing" and demand was thus futile. *Id.* ¶¶ 12, 90. More specifically, plaintiffs assert that AbbVie's entire board faced a substantial likelihood of liability for their actions—the second *Zuckerberg* question—for three separate reasons. [51] at 8–15.

First, plaintiffs assert, the board (i.e., the Director Defendants) "breached their duty of oversight" by allowing the allegedly false statements about Rinvoq to be made and thus faces a substantial likelihood of liability under state law, *see* [44] ¶¶ 89–90; [51] at 8–15, as well as a substantial likelihood of liability under § 14(a) for the alleged misstatements in the proxy statement, *see* [44] ¶¶ 12, 88; [51] at 13–14. Additionally, plaintiffs contend that 6 of the 12 Director Defendants—each of whom were members of AbbVie's audit committee and therefore were "responsible for the effectiveness of [AbbVie's] internal controls, the integrity of its financial statements, and its risk management"—"failed to oversee the risks impacting [AbbVie], namely the safety

concerns with JAK inhibitors and related FDA actions." *Id.* ¶ 87. They thus allowed misleading statements to be made (both about Rinvoq more generally and in the 2021 proxy statements more specifically) and incurred liability in the course of doing so. *Id.* Finally, plaintiffs argue, because defendant Gonzalez was AbbVie's CEO, a named defendant in the securities class action, and a source of some of the Rinvoq-related statements at issue, he had an interest in demands involving his own wrongdoing. *Id.* ¶ 12, 86.

For the reasons discussed next, plaintiffs have not alleged facts supporting a conclusion that at least half of AbbVie's board faced a substantial likelihood of liability—under state law or § 14(a). They thus have not shown demand futility.

1.  *Substantial likelihood of liability for breaches of fiduciary duties relating to statements about Rinvoq (Counts I and IV)*

Plaintiffs do not allege sufficient facts to support a conclusion that at least half of AbbVie's board (i.e., at least half the Director Defendants) faced a substantial likelihood of liability under Delaware law for breaches of fiduciary duties arising out of the Rinvoq-related statements made in 2021.

Corporate fiduciaries, like the Director Defendants, have duties of loyalty and candor under Delaware law. [44] ¶ 72; *see Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992) (duty of candor represents "the well-recognized proposition that directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action"); *Zuckerberg*, 262 A.3d at 1050 (duty of loyalty "requires an undivided and unselfish loyalty to the corporation and demands that there shall be no conflict between duty

13

and self-interest").[7] Corporate fiduciaries can breach their duty of candor by making materially false statements, omitting material facts, or making a misleading partial disclosure. *See Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009). Corporate fiduciaries can breach their duty of loyalty when they fail to act in the good-faith belief that their actions are in the company's best interest or fail to act in the face of a known duty to act. *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

Plaintiffs argue that the Director Defendants violated these duties by allowing, between April 30, 2021, and June 8, 2021, Gonzalez, Severino, Stewart, and Michael to make statements about Rinvoq's future that were "materially misleading because they failed to disclose": (1) "that Rinvoq was sufficiently similar to Xeljanz as a JAK inhibitor that the FDA would find the safety concerns from the [additional trial for Xeljanz] also applied to Rinvoq"; (2) "the FDA would require significant safety warnings for Rinvoq in light of" the additional Xeljanz trial; and (3) that these safety concerns would delay the FDA's approval of expanded treatment uses of Rinvoq. [44] ¶ 48(a)–(c); *see also id.* ¶¶ 86–96; [51] at 9–10 (plaintiffs allege that "the Director Defendants . . . knew that Rinvoq was a JAK inhibitor, relied on the same mechanism of action as Xeljanz, and, as a result, carried the same risk of side-effects and would

---

[7] In their complaint, plaintiffs assert that the Director Defendants also owed a duty of care to AbbVie. *E.g.*, [44] ¶ 72, 78. In response, in their motion to dismiss, defendants argue that AbbVie's directors are exculpated by the AbbVie charter from liability for any breaches of a duty of care, *see* [46] at 7; [55] at 10, and that exculpated care violations do not excuse pre-suit demand, *see Zuckerberg*, 262 A.3d at 1054. Because Plaintiffs do not dispute these points, *see generally* [51] at 8-13 (discussing only duties of candor and loyalty), the duty of care need not be discussed further.

therefore be subjected to the same exacting regulatory scrutiny" and by permitting representations to the contrary to be made, "breached their fiduciary duty of loyalty and candor").

Plaintiffs adequately allege facts that allow the reasonable inference that the Director Defendants knew that Rinvoq was a JAK inhibitor that shared a mechanism of action with Xeljanz. [44] ¶ 37. The Officer Defendants' public statements themselves—which repeatedly juxtaposed Xeljanz with Rinvoq and even described both drugs as being part of "the JAK class in aggregate," *id.* ¶ 47—supply a basis for that inference. But according to the facts pleaded by plaintiffs, it was not until June 25, 2021, that AbbVie revealed that the FDA's review of expanded treatment options for Rinvoq would be delayed because of ongoing safety concerns with Xeljanz. *Id.* ¶ 61. And it was not until September 1, 2021—more than a month after the last of the alleged Rinvoq-related misrepresentations—that the FDA announced the final results of the Xeljanz safety trial and that these results would impact Rinvoq going forward. *Id.* ¶ 64.

Critically, plaintiffs do not allege that any defendant—let alone at least half of the Director Defendants—had prior knowledge of these FDA actions. Nor do plaintiffs allege that Gonzalez or others misrepresented internal AbbVie data on Rinvoq, or that this data otherwise did not support the Officer Defendants' optimistic predictions. *E.g.*, [44] ¶¶ 44, 46. They thus have not alleged facts that would indicate any Director Defendants "knew that Rinvoq . . . would [] be subjected to the same exacting regulatory scrutiny" as Xeljanz, *see* [51] at 9, or had reason to doubt any of

the Officer Defendants' public statements about Rinvoq. Delaware law does not require directors to disclose things of which they are unaware. *Pfeffer*, 965. A.2d at 687 ("If the [] Directors did not know or have reason to know the allegedly missing facts, however, then logically the directors could not disclose them."); *Owens v. Mayleben*, 2020 WL 748023, at *8 (Del. Ch. Feb. 13, 2020) ("While Plaintiff urges the Court to infer scienter, the Complaint pleads no facts that would allow a reasonable inference the Outside Directors, individually or collectively, knew that anything included in the press release was false.").

Certainly, the Officer Defendants' statements regarding Rinvoq failed to correctly predict future FDA actions. But under Delaware law, incorrect or overly optimistic predictions are not in themselves false or misleading statements that might create a substantial likelihood of liability. "An optimistic prediction regarding a company's future prospects is not a 'falsehood' absent evidence that it was not made in good faith (i.e., not genuinely believed to be true) or that there was no reasonable foundation for the prediction." *Hubbard v. Hibbard Brown & Co.*, 633 A.2d 345, 350 (Del. 1993)[8]; *see also Aureus Holdings, LLC v. Kubient, Inc.*, 2021 WL 3891733, at *8 (Del. Super. Aug. 31, 2021) ("Forward-looking statements of opinion are actionable as fraudulent only if they were known to be false when made or were made with a lack

---

[8] *Hubbard* involved an alleged violation of what is now 6 Del. C. § 73-201(2) of the Delaware Securities Act, which prohibits false and misleading statements in the sale of securities. *Hubbard* discusses the reliance and scienter requirements of § 73-201(c), *Hubbard*, 633 A.2d at 349, but the Delaware Division of Securities has since concluded that, after a 2013 revision to the Act, those requirements do not apply to cases brought by securities regulators. *See In the Matter of: Swan Energy*, Inc., 2022 WL 22672888, at *17 (Del. Div. Sec.) The Court does not understand this intervening statutory change to affect *Hubbard*'s general conclusions or their applicability to private litigants.

of good faith."). Plaintiffs have not alleged facts that allow the reasonable inference that AbbVie officers or directors did not genuinely believe their statements about Rinvoq, or that the data referenced and relied upon did not provide a reasonable foundation for those statements, at the time they were made.

Plaintiffs argue that, at the pleading stage, courts can infer knowledge by a company's directors where that information relates to a key part of the company's business. [51] at 10. Plaintiffs argue that that this inference is especially strong for members of the Audit Committee (six of the Director Defendants and thus half of AbbVie's board) because of that committee's special oversight responsibilities. [44] ¶ 87; [51] at 12. In support of this argument, plaintiffs rely primarily on *Rosenbloom v. Pyott*, 765 F.3d 1137, 1151, 1154 (9th Cir. 2014), where the Ninth Circuit found it plausible to infer that a pharmaceutical company's board knew or should have known about unlawful, off-label promotion of a drug, when the board had adopted a plan describing increasing off-label sales as a "top corporate priority." *Rosenbloom* observed that "[i]n demand futility cases, courts have repeatedly emphasized that it is especially plausible to infer board interest in and knowledge of developments relating to a product that is critical to a company's success or is otherwise of special importance to it." *Id*. at 1154 (collecting cases, some of which plaintiffs also cite here). But as defendants point out, *Rosenbloom* did not infer board knowledge without sufficient supporting factual allegations. [55] at 8. Instead, in *Rosenbloom*, the plaintiffs "offer[ed] a battery of particularized factual allegations that strongly support[ed] an inference . . . that the Board knew of and did nothing about illegal

activity." *See Towers v. Iger*, 912 F.3d 523, 532 (9th Cir. 2018) (quoting *Rosenbloom*, 765 F.3d at 1152). Such allegations included that the board "closely and regularly monitored" potentially illicit activities; "received data" that "qualifie[d] as a 'red flag'" of illegality; and "received repeated FDA warnings about illegal" activities. *Id.* (citing *Rosenbloom*, 912 F.3d at 1152–54). And *Rosenbloom* is not alone in that regard. *See, e.g., In re Fitbit, Inc. Stockholder Derivative Litig.*, CV 2017-0402-JRS, 2018 WL 6587159, at *15 n.179 (Del. Ch. Dec. 14, 2018) ("The cases Defendants cite, however, suggest the doctrine is not sufficient *on its own* in the context of generally pled allegations to establish scienter."); *Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 902–03 (N.D. Ill. 2020) (distinguishing *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044 (C.D. Cal. 2008), because the *Countrywide* plaintiffs alleged with particularity that "reports generated by the Chief Risk Officer [analyzing loan performance and adherence to underwriting policies] were regularly delivered to [the relevant] executives" such that the reports contributed to a strong inference that the executives should have known of deviations from underwriting standards).

The operative complaint lacks any such details. Even assuming that Rinvoq was core to AbbVie's operations, and even inferring that the board would know details of its development, plaintiffs still do not allege that anyone at AbbVie—let alone at least half of its board of directors—knew what the FDA would do at the time the statements in question were made, or knew or had reason to believe that any of the Officer Defendants misrepresented internal data in their Rinvoq-related predictions, or knew or had reason to believe that the internal data did not actually support the

optimistic predictions about Rinvoq. In other words, the facts alleged do not support a reasonable inference that any of the Director Defendants were on notice that those predictions would not come to pass, or that they needed to "prevent or correct . . . statements made by [AbbVie's] corporate fiduciaries . . . in various interviews and other public pronouncements." [51] at 12. That a prediction does not come to fruition does not retroactively make it a lie or omission.

Thus, even taking all inferences in plaintiffs' favor, they have not met their burden of alleging facts that, if true, would suggest a substantial likelihood of liability for at least half of the Director Defendants based on breaches of fiduciary duties arising from the Rinvoq-related statements at issue. Plaintiffs' claim under Count I therefore fails. Plaintiffs' claim for unjust enrichment (Count IV) also fails as it is premised exclusively on the proposition that defendants breached their fiduciary duties.

      2.    *Substantial likelihood of liability for a § 14(a) violation relating to the 2021 proxy statement (Count II)*

Plaintiffs do not allege sufficient facts to support a conclusion that at least half of AbbVie's board (i.e., at least half the Director Defendants) faced a substantial likelihood of liability under § 14(a) the Security Exchange Act of 1934 in connection with the proxy statement issued in March 2021.

Section 14(a) prohibits soliciting proxies "in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe." 15 U.S.C. § 78n(a)(1); *see also Kuebler v. Vectren Corp.*, 13 F.4th 631, 637 (7th Cir. 2021). One such rule is the SEC's Rule 14a-9, which prohibits proxy statements from including

"any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a). Liability under § 14(a) requires "(i) that the proxy statement contained a material misstatement or omission that (ii) caused the plaintiff's injury, and (iii) that the proxy solicitation was an essential link in accomplishing the transaction." *Kuebler*, 13 F.4th at 637.

In their complaint, plaintiffs allege that the March 2021 proxy statement contained two "misleading statements." [44] ¶ 60. First, the statement asserted that the incentive stock program would "align the interests of our employees, officers, and non-employee directors with those of other stockholders" which would "motivate recipients to focus on behaviors that, over time, lead to sustained growth in stockholder value" and that this program did not include "certain pay design features that may have the potential to encourage excessive risk-taking." *Id.* ¶¶ 50–52. Plaintiffs argue this statement was misleading because the incentive stock program in fact encouraged defendants to inflate AbbVie's stock price by making misleadingly optimistic statements about Rinvoq. *Id.* ¶ 52.

Second, the proxy statement recommended AbbVie stockholders vote against a proposal to have an independent director serve as board chair because AbbVie's "other robust corporate government practices" made an independent chair unnecessary. *Id.* ¶ 54. This section also referenced AbbVie's existing corporate governance guidelines and policies. *Id.* ¶¶ 56–57. This portion of the statement was

20

materially misleading, plaintiffs say, because defendants subsequently violated their fiduciary duties by making, or permitting to be made, the allegedly false and misleading statements about Rinvoq discussed above. *Id.* ¶ 59.

Again, timing matters. The operative complaint does not allege facts that would allow an inference that anything in the proxy statement was actually false or misleading *when it was issued*, a requisite for liability under § 14(a). *See Kuebler*, 13 F.4th at 637; 17 C.F.R. § 240.14a-9(a). For example, the proxy statement, issued in March 2021, says that the incentive stock program will "align" the interests of "outstanding employees, officers, and non-employee directors of AbbVie" with "those of AbbVie's other stockholders" and that AbbVie did "not include certain pay design features that may have the potential to encourage excessive risk-taking." [44] ¶ 50–51. Although the complaint alleges that defendants later made statements about Rinvoq that harmed AbbVie stockholders, it does not follow from these allegations of later misbehavior that the broad assertions in the proxy statement were false or misleading in March 2021. Moreover, as discussed above, plaintiffs have not alleged facts that would allow the inference that the statements were actually false rather than merely overly optimistic. Nor have plaintiffs advanced a legal argument that even overly optimistic proxy statements violate § 14(a).

The proxy statement did not, for example, guarantee that under the incentive stock program AbbVie officers would never engage in risky behavior. The same section of the proxy statement says that the purpose of the incentive stock plan was "to attract and retain outstanding employees," but presumably if some AbbVie

employees were later proven not to be outstanding, or some outstanding employees were not retained, those later events would not create liability under § 14(a). The complaint also does not indicate what, if anything, was omitted from the statement regarding risk management or interest alignment that would have been "necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a). And because the operative complaint does not allege what, if anything, was omitted, plaintiffs have not alleged facts that would allow the reasonable inference that any omissions were material. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (omissions material if substantial likelihood a reasonable shareholder would consider it important in how to vote).

Similarly, plaintiffs point to proxy-statement text stating that "AbbVie has other robust corporate governance practices designed to protect longterm shareholder value." [44] ¶ 54. But they do not allege that such practices do not exist, that they were misrepresented in the proxy statement, or that any material facts regarding these practices were omitted from the statement. And even if the later statements concerning Rinvoq made by Gonzalez and others were false and misleading, it is not clear how those later statements would render the proxy statement misleading at the time it was made. 17 C.F.R. § 240.14a-9(a).

Finally, the operative complaint does not causally connect the proxy statement to the allegedly injurious behavior by defendants. *Kuebler*, 13 F.4th at 637. Plaintiffs contend that the approval of the incentive stock program and rejection of the independent chair proposal "allowed and incentivized the wrongful conduct related

to Rinvoq that has harmed" AbbVie. [51] at 14. But the complaint does not indicate how the incentive stock program did so, when the program went into effect, or whether some other incentive program already existed. And, for liability under § 14(a), plaintiffs must show that the false statement or omission was the proximate cause of their economic loss. *Kuebler*, 13 F.4th at 645. Because plaintiffs have not alleged facts that would allow the reasonable inference that AbbVie officers were or believed themselves to be likely to benefit from inflated stock prices at the time the allegedly harmful statements were made, or that such a benefit or belief stemmed from the proxy statements, they have not alleged the necessary causation.

The operative complaint also does not indicate when Gonzlez would have been replaced as board chair had that vote gone the other way, or how or why his replacement would have prevented any of the defendants from making the allegedly false and misleading statements about Rinvoq, or allowing those statements to be made. Plaintiffs have thus, again, not alleged facts that would allow an inference of causation between the proxy statement and the alleged misbehavior. *Kuebler*, 13 F.4th at 637.

### 3. *Substantial likelihood of liability for contribution and indemnification claim (Count III)*

Plaintiffs' contribution and indemnification claim (Count III) are premised entirely on AbbVie's possible liability in the now-dismissed securities class action. [44] ¶ 104. Because the threat of liability went away when that suit was dismissed, plaintiffs have not alleged a substantial likelihood of liability on that claim.

### B.    Best Interest of AbbVie

Defendants argue that the Court should dismiss the complaint for a separate reason as well—namely, that plaintiffs are not acting in AbbVie's best interest. [46] at 14. More specifically, defendants maintain that plaintiffs cannot be fairly and adequately representing the interest of AbbVie shareholders because success on their claims here would have established liability for AbbVie in the now-dismissed securities class action. *Id.* With that class action's dismissal, any the specter of liability for AbbVie from that suit has also disappeared. This argument therefore has been overtaken by intervening events.

And even if the suit were resurrected, or a similar suit were brought, defendants' best interest argument strikes the Court as a dubious one. Neither of the unreported Delaware cases defendants cite resulted in dismissal on this ground, and neither is precedential. *See generally Brenner v. Albrecht*, 2012 WL 252286 (Del. Ch. Jan. 27, 2012); *In re Massey Energy Co.*, CIV.A. 5430-VCS, 2011 WL 2176479, at *27 (Del. Ch. May 31, 2011) (in dicta, noting that plaintiffs "should . . . be reluctant to prosecute the Derivative Claims . . . until the direct claims against Massey are resolved"). It is also not clear from defendants' best-interest argument when shareholder derivative litigation would be appropriate at all. A shareholder derivative suit involving misbehavior by corporate officers or directors will often "make [] corporate loss more likely", [46] at 15, in some future litigation, but that cannot be a blanket defense against such actions, which are permitted by both federal and Delaware law.

24

### C.    Forum Non Conveniens

Finally, defendants contend that because AbbVie's charter requires all shareholder derivative actions to be filed in the Delaware Court of Chancery, both the state-law claims and the § 14(a) claim should be dismissed for *forum non conveniens*. [46] at 3. However, defendants also acknowledge that, with regard to the § 14(a) claim, this argument has been squarely foreclosed by the Seventh Circuit. *Id.* at 5; *Seafarers Pension Plan v. Bradway*, 23 F.4th 714, 717–18 (7th Cir. 2022). In light of *Seafarers* and because the case is being dismissed on other grounds, the Court need not discuss defendants' *forum non conveniens* argument any further.

## IV.    Conclusion

Because plaintiffs have not alleged facts that would support their assertion that making pre-suit demand upon the AbbVie board would have been futile, defendants' motion to dismiss [45] is GRANTED and plaintiffs' complaint is DISMISSED without prejudice.

Plaintiffs may refile an amended complaint if they can cure the deficiencies identified above while still complying with their obligations under Federal Rule of Civil Procedure 11. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519–20 (7th Cir. 2015) ("Unless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss."). Any amended complaint is due on or before November 4, 2024. If plaintiffs do not file an

amended complaint by that date, the dismissal will automatically convert to a dismissal with prejudice.

ENTER:  10/4/24

_____
Georgia N. Alexakis
United States District Judge